UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JEFF SMITH,

                Plaintiff,

    v.                                              No. 03-CV-0048
                                                  (DNH/GHL)

ROBERT K. WOODS, Deputy Superintendent;
JOSEPH R. BELARGE, Captain; G.J. O'DONNELL,
Sergeant; F.S.A. ANTONELLI; WAYNE HOLT,
Correction Officer;

                Defendants.

_____

APPEARANCES:                           OF COUNSEL:

JEFF SMITH
  Plaintiff, *Pro Se*
400-430 East 30th Street
New York, NY 10016

HON. ELIOT L. SPITZER                      KELLY L. MUNKWITZ, ESQ.
Attorney General for the State of New York     Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224-0341

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

_____This matter has been referred to me for Report and Recommendation by the Honorable

David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c) of the Rules of Practice for this Court.  In this *pro se* civil rights action brought under 42

U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges that five employees of Upstate Correctional

Facility--Deputy Superintendent Robert K. Woods, Captain Joseph R. Belarge, Sergeant G.J.

O'Donnel, Food Service Administrator Richard Antonelli, and Correction Officer Wayne Holt

("Defendants")--violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by (1) retaliating against him for having previously filed a complaint, (2) subjecting him to an unreasonable search and seizure, (3) subjecting him to a damaged bunk bed while he was housed in the Upstate Correctional Facility Special Housing Unit, and (4) taking away his "good time" credits without affording him due process.  (Dkt. No. 5 [Plf.'s Am. Compl.].)[1]

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion."  Both Plaintiff and Defendants have responded to each other's motion (Dkt. Nos. 42, 45), and replied to the other's response (Dkt. Nos. 47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an

---

[1]        Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures.  *See Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised.  In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted].  (*See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th . . . Amendment[] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I.   SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings.  "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the . . . responsibility of granting significant liberality in how *pro se* pleadings are construed."  *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460,

---

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

467 (S.D.N.Y. 1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir. 1989).  For example, where a plaintiff is proceeding *pro se*, and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, . . . [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.*, 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).  In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment." *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky*, 251 F. Supp.2d 1208, 1211 (W.D.N.Y. 2003) (citations omitted).

## II.   STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record[3] and are not

---

[3]      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citations omitted).

specifically controverted by the plaintiff.[4]

To "specifically controvert[]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises."[5]

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment).[6] However, to be

---

[4]     *See* Local Rule 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").

[5]     Local Rule 7.1(a)(3); *see*, *e.g.*, *Jones v. Smithkline Beecham Corp.*, 309 F. Supp.2d 343, 346 (N.D.N.Y. 2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact.  Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement.  Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles*, 250 F. Supp.2d 63, 67 (N.D.N.Y. 2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record.  Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad*, 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement . . . are accepted as true."); *Adams v. N.Y. State Thruway Auth.*, 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n.1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7.1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller*, 258 F.3d 62, 74 (2d Cir. 2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

[6]     *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary

sufficient to create a "factual issue," such an affidavit or verified complaint must, among other

things, be based "on personal knowledge."[7]  An affidavit or verified complaint is not based on

personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[8]

    Similarly, such an affidavit or verified complaint must not be conclusory.[9]  Of course, an

---

judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the . . . affidavits . . . show that there is no genuine issue as to any material fact . . . .").

[7]      Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) [citations omitted], *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).

[8]      *See Patterson*, 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'. . . [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief . . . .  Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993).

[9]      *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

affidavit may be conclusory because its assertions are too general.[10]  However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[11]  Indeed, it has long been the rule in the Second Circuit that "issues of

_____

[10]     *See, e.g., Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

[11]     *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554-555 (2d Cir. 2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner*, 03-CV-3789, 2006 WL 357824, at *3-4 & n.7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia*

credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.*, 455 F. Supp. 252, 266, n.25 (S.D.N.Y. 1978), *aff'd without opinion*, 603 F.2d 214 (2d Cir. 1979).

Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and

---

*Univ.*, 332 F. Supp.2d 599, 612 (S.D.N.Y. 2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd*, 136 Fed. Appx. 383 (2d Cir. 2005) (unreported decision).

verified Amended Complaint are often argumentative in nature (in violation of Local Rule
7.1[a][2]) and not based on personal knowledge (but only hearsay or pure speculation).  Finally,
his Declarations and verified Amended Complaint are often conclusory and replete with
inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[] [Inmate Alcivar's] legal
materials other than [the times when he and Inmates Lipman and Robles approached Defendant
Holt with such materials]."[12]  However, his own letters and deposition testimony contain repeated
representations that he was, at other times, in possession of such materials.[13]

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in
Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by

---

[12]        (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

[13]        (*See, e.g.*, Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching
transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take
"control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff "***stuck with them*** as
well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law
clerk's work station in the law library out of a fear that the document may fall into another
inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's
"wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his
belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt.
No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in
which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal
documents, that is one inmate that housed [sic] in the same dorm as him and myself. . . .  Peter
told me that you have copies of all his papers, those of which are the same as the papers ***I have
here***"]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from
Plaintiff, in which he states, "I am going to ***hold a copy of the complaint***" in Inmate Alcivar's
federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02
letter, in which he states, "in the future if anything should come of a matter of said documents
***being in my possession*** . . . you and the administration cannot take any action against the
inmate's family nor myself"] [emphasis added].)

Woods through the U.S. mail."[14]  However, those documents contained copies of two letters--

dated July 4, 2002, and July 16, 2002--from Plaintiff to Inmate Alcivar's two daughters.[15]

Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of

those letters to Plaintiff between August 19, 2006, and August 31, 2002--the time period during

which Defendant Woods allegedly intercepted Plaintiff's mail.[16]

Generally, I find such assertions by Plaintiff to be too incredible to be believed by

reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff,

are supported by evidence in the record, and are not specifically controverted by Plaintiff:

## Background

1.      From July of 2002 until November of 2002 (the time period relevant to the

allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and

custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at

the Greene Correctional Facility ("Greene C.F.").[17]

2.      At all times relevant to this action, Defendant Robert K. Woods was the Deputy

Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at

---

[14]        (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]        (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband
allegedly found in Plaintiff's "cube"].)

[16]        (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[17]        (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2
[Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard

Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a

Corrections Officer at Greene C.F.[18]

### Plaintiff's Legal Assistance to Inmate Peter Alcivar
### and Communications with Inmate Alcivar's Daughters

3.      At some point in 2001, Inmate Peter Alcivar filed a civil rights action against

DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court

for the Northern District of New York (civil action number 9:01-CV-1198).[19]

4.      On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by

answering a question regarding an affidavit.[20]  At the time, Plaintiff was not an inmate law

clerk.[21]

5.      On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical

---

[18]      (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8  [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

[19]      (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

[20]      (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]      (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1,  ¶ 13 [Plf.'s Rule 7.1 Response].)

Center to receive treatment for cancer.[22]

      6.     On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two

daughters about Inmate Alcivar's pending federal civil rights action.[23]  In pertinent part, the letter

stated,

> I am writing to inform you of my assistance to Peter [Alcivar]
> in the above referenced matter [case number 9:01-CV-1198] where he
> has a Section 1983 of the U.S.C.A. Civil Rights complaint against the
> Department of Correctional Services now pending in the United States
> District Court for the Northern District of New York; that is if he
> (Peter) hasn't already told both of you that I am helping him with the
> filing of his motions, etc. . . .
>
> Getting right to the point for the purpose of writing you, and
> letting you know what is going on with Peter's case.  There is [sic] two
> inmates that Peter trusted with his papers and other legal documents,
> that is one inmate that housed [sic] in the same dorm as him and
> myself. . . .
>
> I have already wrote [sic] to the court on June 24, 2002,
> informing said court as to Peter's current situation . . . .  See copy of
> the <u>letter addressed to the court</u> . . . enclosed with this letter I am
> writing you. . . .
>
> Peter told me that you have copies of all his papers, those of
> which are the same as the papers I have here. . . .
>
> [I]f you wish . . . you all could come to the facility to see me, I
> would then go over the case with all of you, tell all of you what I know
> from Peter, the research that I have done for him and the list of cases
> of authority that I have and would cite in his motions and use at trial; I
> also could give you all of his legal documents right there . . . .

---

[22]     (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6
[Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany
Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit
and its contents"].)

[23]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02
from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A
at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits
having written and sent the letter dated 7/4/02].)

> Both of you should . . . let Peter know that he should not worry about the case, it is not going to be dismissed . . . because I already wrote to the court for him.[24]

7.        On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[25]

8.        On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[26]  In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[27]  In addition, the last page of the letter states:

> NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public.  Make a copy for your files and send me the <u>original</u>.
>
>     It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here.  By doing the above your [sic] are giving me consent to have said documents in my

---

[24]      (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

[25]      (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5,  "Facts of the Incident," ¶ 3 [Am. Compl.].)

[26]      (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18  [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]      (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

possession.[28]

9.      On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[29]  In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold . . . ."

**Plaintiff's Communications with Defendant Woods
and the Search of Plaintiff's Prison Cell (or "Cube")**

10.      On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance.  This must be in person at your earliest convenience.  Thank you for your professional attention to this request."[31]

11.      On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[32]  The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote

---

[28]      (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

[29]      (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

[30]      (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]      (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

[32]      (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

to you requesting to see you.  I must speak to you before July 23, 2002.  This matter is very

important.  Thank you for your attention."[33]

12.    Defendant Woods did not respond to Plaintiff's notes for two reasons: (1)

Defendant Woods did not receive either of the two notes until after the date referenced by

Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes

were "cryptic."[34]

13.    On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy

Superintendent Woods.[35]  The note stated, in pertinent part:

> Please take notice that since you have neglected to answer the
> above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to
> meet with me about a very serious matter concerning a >DEAD<
> man's legal documents, in the future if anything should come of a
> matter of said documents being in my possession or the inmate's
> family should have any questions of same and I answer those questions
> according to law, you and the administration cannot take any action
> against the inmate's family nor myself.[36]

---

[33]    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

[34]    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule
7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21  [Plf.'s Rule 7.1 Response, not
specifically controverting either that Defendant Woods did not receive the notes until after July
23, 2003, or that Defendant Woods believed the notes to be "cryic"]; Dkt. No. 37, Part 8, Ex. D
[Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that
Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

[35]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff.,
attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff
wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically
controverting that Plaintiff wrote and sent note].)

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

14.     On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff.[37]

That memorandum stated, in pertinent part:

> Your August 5th letter . . . makes reference to legal documents
> belonging to deceased Inmate Alcivar . . . .  I have directed Law
> Library Officer Holt to speak to you and recover from you any legal
> documents of deceased Inmate Alcivar . . . .  In fact, you should have
> turned over any such documents to Law Library Officer Holt
> immediately.[38]

15.     On August 7, 2002, Plaintiff received Defendant Woods' memorandum.[39]

16.     Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for

Inmate Alcivar's legal documents.[40]  Plaintiff denied having such documents.[41]

17.     As a result, at some point between August 5, 2002, and August 31, 2002,

Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to

---

[37]     (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum];
Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent
Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the
memorandum].)

[38]     (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

[39]     (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

[40]     (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42,
Part 1, ¶ 24  [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29,
¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]     (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42,
Part 1, ¶ 24  [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to
Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of
Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7
[Holt Aff.].)

interview Plaintiff about his statements made in his August 5, 2002, note.[42]

18.     At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers).[43]  At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters).[44]

---

[42]     (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24  [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

[43]     (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]     (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if

19.     At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and

O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant

Woods.[45]   At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate

Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate

Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20.     Relying on the documents discovered and the subsequent interview conducted,

Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47]

The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to

Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging

---

anything should come of a matter of said documents being in my possession . . . you and the
administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No.
37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told
Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt.
No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from
any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

[45]     (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took
place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place
despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts
of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on
8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report,
stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]     (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in
Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the
documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A  at 2
[Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored
the documents in an evidence locker on 8/31/02].)

[47]     (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli
Aff., attaching 8/31/02 misbehavior report].)

legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and

(3) soliciting materials from Inmate Alcivar's family members without authorization in violation

of Inmate Rule 103.20.[48]

21.     During the time period at issue (i.e., May through August of 2002), Rule 180.17

of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to

other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of

DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property

(such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS'

Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services

from any person other than an immediate family member without the consent or approval of the

Superintendent or his designee.[51]

22.     On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by

---

[48]     (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

[49]     (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]     (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].)  *See also* 7 N.Y.C.R.R. § 270.02[B][14][v].

[51]     (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].)  *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

Defendant Antonelli.[52]  Defendant Antonelli found Plaintiff guilty of all three charges, and

imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days

loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of

"good time" credits.[53]  In reaching his finding of guilt, Defendant Antonelli relied on (1) the

assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff

had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that

Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and

(3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar

had been found in Plaintiff's cell (or "cube").[54]

     23.    Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary

decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program,

who affirmed that decision on October 28, 2002.[55]  Plaintiff's appeal did not complain about any

---

[52]    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No.
42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No.
42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42,
Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically
controverting the rest of this fact, and, in any event not citing any admissible evidence in support
of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary
judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am.
Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among
other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate
Alcivar's daughters].)

[55]    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No.
42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz
Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No.
38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal

lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint.[56]

24.    On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence.[57]  Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days.[58]  However, Plaintiff's good time loss was unaffected by the discretionary review.[59]

**Meetings Between  Defendants Woods, Belarge and O'Donnell**

25.    At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff.[60]  Defendant Belarge then met with Defendant

---

and Mr. Selsky's affirmance].)

[56]    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[57]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

[58]    (*Id*.)

[59]    (*Id*.)

[60]    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

O'Donnell to discuss Plaintiff.[61]

26.     Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior

report on August 31, 2002) were held according to standard procedure at Greene C.F.[62]

Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had

violated prison rules.[63]

## Plaintiff's Bunk(s) in SHU

27.     As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s

SHU from approximately September 6, 2002, to November 21, 2002.[64]

---

[61]     (Dkt. No. 37, Part 2, ¶ 38 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 38 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

[62]     (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

[63]     (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

[64]     (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002 . . . ."].)

28.    At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU.[65]

29.    On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned.[66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood.[67]  Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU.[68]

_____

[65]     (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

[66]     (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]     (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]     (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part

III.    **ANALYSIS**

    A.    **Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim**

        In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

        Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill*, 389

---

8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

F.3d at 381-383.  Because of the relative ease with which claims of retaliation can be incanted,

however, courts have scrutinized such retaliation claims with "skepticism and particular care."

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d. Cir. 1995); *see also Flaherty v. Coughlin*, 713 F.2d 10,

13 (2d Cir. 1983).  As the Second Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are
> difficult to dispose of on the pleadings because they involve questions
> of intent and are therefore easily fabricated.  Second, prisoners' claims
> of retaliation pose a substantial risk of unwarranted judicial intrusion
> into matters of general prison administration.  This is so because
> virtually any adverse action taken against a prisoner by a prison
> official--even those otherwise not rising to the level of a constitutional
> violation--can be characterized as a constitutionally proscribed
> retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other*

*grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by

the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2)

the defendants took "adverse action" against the plaintiff–namely, action that would deter a

similarly situated individual of ordinary firmness from exercising his or her constitutional rights;

and (3) there was a causal connection between the protected speech and the adverse action--in

other words, that the protected conduct was a "substantial or motivating factor" in the

defendants' decision to take action against the plaintiff.   *Mount Healthy City Sch. Dist. Bd. of*

*Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239

F.3d 489, 492 [2d. Cir. 2001]).  Under this analysis, adverse action taken for both proper and

improper reasons may be upheld if the action would have been taken based on the proper reasons

alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Here, Plaintiff's claim fails for several reasons.  I acknowledge that the First Amendment

protects, not only the filing of written grievances and complaints, but, under some circumstances,

the making of oral complaints to corrections officers.[69]  However, even assuming Plaintiff had a

constitutionally protected right to make both written and *oral* complaints about Defendant

Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff

against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

For example, no evidence exists that Plaintiff submitted any grievances or complaints

against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred

complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the

disciplinary hearing.[70]  Plaintiff's letter did not mention Defendant Antonelli.[71]  In any event, no

---

[69]      *See Malik'El v. N.Y. State DOCS*, 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at
*7 & n.1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J.) (under circumstances, plaintiff's oral
complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S.
Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips*, 66 F.3d 470,
479 (2d Cir. 1995) ("In the context of the confrontation described in [the plaintiff's] own words,
there was no clearly established First Amendment right to approach and speak to Officer
Rubin.") (emphasis added); *Garrido v. Coughlin*, 716 F. Supp. 98, 101 (S.D.N.Y. 1989)
(plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct
under the First Amendment).

[70]      (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file
from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about
the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24
[Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent
Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90
[Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]      (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of
complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not
mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37,

evidence exists indicating that Defendant Antonelli knew about any grievances against him by

Plaintiff at the time of Plaintiff's disciplinary hearing.[72]  Similarly, no evidence exists that he

ever confronted Defendant Antonelli with an oral complaint about the mess hall–other than

Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with,

Defendant Antonelli about the mess hall before the disciplinary hearing.[73]  Finally, the record

evidence establishes that Defendant Antonelli could, and indeed would, have reached the same

disciplinary hearing decision (and imposed the same penalties) despite any such complaints or

grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's

disciplinary hearing decision).[74]

---

Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which
Plaintiff admits this fact].)

[72]      (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I . . . understand that
plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against
me.  I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12
[Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's
affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over
plaintiff's tier hearing on September 6, 2002 . . . and that was due to Antonelli's encounter with
plaintiff one week prior to holding said hearing," without providing any specifics about the
alleged "encounter," without providing any assertion that it was Antonelli who was motivated by
the alleged "encounter," and without providing reason to believe Plaintiff had personal
knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

[73]      (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one
week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli];
Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition,
in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant
Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess
hall].)

[74]      (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which
Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on
appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

**B.      Whether Plaintiff Has Failed to State a Fourth Amendment Claim**

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim.  However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction.[75]

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the

---

[75]      (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations.  So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action . . ." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am".]  *See Clissuras v. CUNY*, 359 F.3d 79, 81 n.3 (2d Cir. 2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3]).

29

court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Thus, the Court has a duty to examine

whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment

claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42

U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of

Plaintiff's Amended Complaint.[76]  Specifically, the allegations contained in Paragraph 15 of his

Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim.[77]  In

pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge . . . had

plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom

was Holt . . . ."[78]

The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred

as Plaintiff alleged, that search was of a prisoner's cell (or "cube").  "[T]he Fourth Amendment

proscription against unreasonable searches does not apply within the confines of a prison cell."

---

[76]    (*See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and
Holt "violat[ed] plaintiff's 4th . . . Amendment[] rights"], ¶ 15 [alleging that Defendant Belarge
"had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No.
37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of
Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged
unjustified search and seizure of his property].)

[77]    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of
Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to"
Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in
your second cause of action . . ." other than a due process claim, and Plaintiff answered, "Not at
this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which
defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a
constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

[78]    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

*Hudson v. Palmer*, 468 U.S. 517, 526 (1984).[79]  Nor does the Fourth Amendment proscription

apply within the confines of a prison "cube."[80]  Indeed, Plaintiff appears to recognize this point of

law.[81]

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth

Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing

various pieces of Plaintiff's outgoing and incoming mail in August of 2002.  However, even if I

did so construe that Amended Complaint, I would conclude that this Court would not have

subject matter jurisdiction over that claim.  The only portion of Plaintiff's Amended Complaint

that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and

conclusory.[82]  Even taking as true Plaintiff's allegations, the mail in question consisted of clearly

identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from,

---

[79]      *See also Tinsley v. Greene*, 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann*, 877 F. Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd*, 122 F.3d 1055 (2d Cir. 1995).

[80]      *See Freeman v. Goord*, 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n.4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin*, 795 F. Supp. 609, 611, 613 (W.D.N.Y. 1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]      (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

[82]      (Dkt. No. 5, ¶ 12 [Am. Compl.].)

persons bearing the last name of Alcivar).[83]  I fail to see how any search and confiscation of such

contraband would have violated the Fourth Amendment.  Indeed, such a search and confiscation

would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the

Inmate Correspondence Program).[84]

      As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

**C.    Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim**

      In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or

even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even

alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and

(2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or

safety.  (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)  Liberally construed, Plaintiff's

response papers argue that (1) he has established a deprivation that is "sufficiently serious"

through his evidence that he experienced a back injury while in SHU as a result of his "twisted

bunk," and (2) he has established such deliberate indifference through his testimony that he orally

---

      [83]     I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

      [84]     *See, e.g.*, DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit . . . services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for . . . photocopied materials, or contraband.") (5/18/02).

complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact

that they "ignored" his complaints.  (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met.

First, the deprivation must be, objectively, 'sufficiently serious'. . . .   [Second,] a prison official

must have a 'sufficiently culpable state of mind.'"  *Farmer v. Brennan*, 511 U.S. 825, 834

(1994).  "In prison-conditions cases that state of mind is one of deliberate indifference to inmate

health or safety . . . ."  *Farmer*, 511 U.S. at 834.

With regard to the first element, "the plaintiff must demonstrate that the conditions of his

confinement resulted in 'unquestioned and serious deprivations of basic human needs' or

'deprive inmates of the minimal civilized measures of life's necessities.'"  *Davidson v. Murray*,

371 F. Supp.2d 361, 370 (W.D.N.Y. 2005) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347

[1981]).  "As recognized by the Supreme Court in *Rhodes*, 'the Constitution does not mandate

comfortable prisons,' . . . and conditions that are 'restrictive and even harsh . . . are part of the

penalty that criminal offenders pay for their offenses against society.'"  *Davidson*, 371 F.

Supp.2d at 370 (quoting *Rhodes*, 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of

mind is one of deliberate indifference to inmate health or safety . . . ."  *Farmer*, 511 U.S. at 834.

"[D]eliberate indifference describes a state of mind more blameworthy than negligence."  *Id*. at

835.  "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*.

at 837.

### 1.       Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as

a result of sleeping on a defective bed.[86]  As far as I can tell from available reported decisions, all

federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil

rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a

serious medical need.[87]  I do not make such an assumption here because, unlike the prisoners in

those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation

consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed.  In addition to

being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of

Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a

---

[85]       "Spondylolisthesis" is defined as "forward movement of the body of one of the
lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth*, 92-
CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n.6 (S.D.N.Y. July 27, 1993) (citing *Stedman's
Medical Dictionary* at 1456 [25th ed. 1990]).

[86]       (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for
Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No.
37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in
which Plaintiff describes his injury generally].)

[87]       *See Villante v. N.Y. State DOCS*, 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at
*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation*, 2002 U.S.
Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland*, 1993 U.S. Dist.
LEXIS 10233, at *13-16, 30; *Smith v. Umar*, 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-
6, 8-10 (E.D. Pa. Nov. 28, 1989).

[88]       (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants--who are
non-medical personnel--violated Plaintiff's Eighth Amendment rights by placing him in, and
keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which
included his allegedly defective bunk].)

claim that the medical staff was deliberately indifferent to any serious medical need.[89]

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90]  In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question.  Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93]  There is even evidence indicating that Plaintiff's back injury existed

---

[89]     (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

[90]     (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]     (*See*, *supra*, Statement of Fact No. 29.)

[92]     (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law.].)

[93]     (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question--Bunk Number

before he was admitted to SHU on September 6, 2002.[94]

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion.  As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective."  Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95]  For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

**2.     Deliberate Indifference**

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the

---

"OS-A1-20(b)"--on **9/23/02**, after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02**, and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02**, or three days after his admission to SHU].)

[94]     (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past**. I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

[95]     *See Faunce v. Gomez*, No. 97-16943, 1998 U.S. App. LEXIS 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby*, 314 F. Supp.2d 619, 620 (N.D. W. Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia*, 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record.  (Dkt. No. 5, ¶¶ 35, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it.[96]  More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times.[97]  Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints.  Indeed, the evidence shows that Plaintiff was

---

[96]        (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]        (*See*, *e.g.*, Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk.[99]

In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December

---

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02--fourteen days after 9/23/02--he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02--fourteen days after 9/23/02--he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

38

11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18,

2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on

September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more

"pain killers" on or after January 10, 2003, along with a back brace.[100]

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials

shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15

days).[101]  Under the circumstances, I find that no reasonable fact-finder could conclude, based on

the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or

safety

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D.    Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he

exhausted his available administrative remedies regarding his Eighth Amendment claim because

he acknowledges that he did not file a written administrative grievance with respect to the alleged

condition of his bunk bed.  (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].)  Liberally

construed, Plaintiff's response papers argue that (1) no administrative remedy was available

because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint

about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

---

[100]      (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

[101]      (*See*, *supra*, Statement of Fact No. 24.)

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants).  (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e.  The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk.  An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue.  If there is no resolution, then the full IGRC conducts a hearing and documents the decision.  Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented.  Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*White v. The State of New York*, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp. Codes R. & Regs. Tit. 7, § 701.7).  Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies.  *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 347-48 (S.D.N.Y. 2002); *Reyes v. Punzal*, 206 F. Supp. 2d 431, 433 (W.D.N.Y. 2002).

40

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.  *See Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).  First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."  *Hemphill*, 380 F.3d at 686 (citation omitted).  Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."  *Id.* (citations omitted).  Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."  *Id*. (citations and internal quotations omitted).

### 1.    Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[102]  He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter.  In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely

---

[102]      (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

immaterial to the fact in question.[103]  Defendants, on the other hand, offer the affidavit of IGRC

Supervisor Marilyn Berlin, who swears, *inter alia*, that "[c]omplaints about maintenance issues

and cell conditions [such as defective bunk beds] are proper subjects of grievances."  (Dkt. No.

48, Part 6, ¶ 3 [Berlin Aff.].)  As a result, I must reject Plaintiff's unsupported assertion that a

defective bunk bed is not grievable.

This does not end the inquiry, however, because "a remedy that prison officials prevent a

prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]."

*Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001), *cited by Abney v. McGinnis*, 380 F.3d 663,

669 (2d Cir. 2004) (holding that "[t]he defendants' failure to implement the multiple rulings in

[plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA.").  More

specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by

prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff*

*indeed did not initiate the grievance process by filing that grievance in reliance on that*

*misrepresentation*, "the formal grievance proceeding required by [the prison grievance system]

was never 'available' to [plaintiff] within the meaning of [the PLRA]."  *See Brown v. Croak*, 312

F.3d 109, 112-113 (3d Cir. 2002), *cited by Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

Here, however, I can find absolutely no evidence in the record before me that IGRC

_____

[103]      (*See*, *e.g.*, Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which
Plaintiff appears to argue--without any citation to evidence--that he orally complained about his
bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a
defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz
Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay
remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for
Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the
grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter.  Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[104]  Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[105]

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer.  (Dkt. No. 17, ¶ 29 [Defs.' Answer])  Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies.  Plaintiff alleges that, on several

---

[104]    (*See*, *e.g.*, Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

occasions during the relevant time period, he made oral complaints about his allegedly defective

bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge.  For

the sake of argument, I will set aside the vagueness of this allegation, its incredibility given

numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of

support by any corroborating evidence.  The problem with Plaintiff's reliance on this allegation is

that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about

his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several

New York State correctional facilities before the incident; and he had even attended a year of law

school.[106]  He admits that, at the time of the incident, he was familiar with the grievance process

at Greene C.F.[107]  Indeed, he had filed grievances immediately before and during this very time

period.[108]  Simply stated, it would have been unreasonable for Plaintiff to believe that he could

fulfill the grievance requirement--which included a requirement that the IGRC's decision be

appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred--

by making some oral complaints to various passers by, whomever they might be.

---

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

**E.    Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim**

In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated.  (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia*, *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Edwards v. Balisok*, 520 U.S. 641 (1997)].)  Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment.  Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[109]  To avoid dismissal on summary judgment grounds, Plaintiff

---

[109]    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely . . . upon the lack of evidentiary support for plaintiff's retaliation claims . . . is sufficient to cast the burden upon the

must introduce evidence raising a question of fact as to (1) whether or not his disciplinary

conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-

time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or

invalidated.[110]  He has not done so.  Indeed, the evidence shows (and Plaintiff concedes) that (1)

Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by

resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged,

or invalidated.[111]

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be

dismissed.

### F.   Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or

even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but

42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy

---

plaintiff to come forward with evidence demonstrating the existence of genuinely disputed
material issues of fact at trial with regard to those claims.") [citations omitted].

[110]   *See Griffin v. Selsky*, 326 F. Supp.2d 429, 430 (W.D.N.Y. 2004); *McNair v.
Jones*, 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y. 2003); *Dawes v. Dibiase*,
91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]   (*See, e.g.*, Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff
was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to
Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's
disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at
32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing
sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though
plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not
make plaintiff's claims 'not cognizable' . . . ."].)

claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3)

Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative

and conclusory allegations of conspiracy, *see*, *e.g.*, Dkt. No. 5, ¶¶ 21-22 (Am. Compl.).  (Dkt.

No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].)  Liberally construed, Plaintiff's response argues

that the evidence does establish such a meeting of the minds because (1) in their affidavits,

Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding

Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never

involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant)

meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary

charge be filed and decided by a hearing officer.  (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

     I agree with Defendants largely for the reasons stated, and based upon the cases cited, in

their memorandum of law.  (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].)  Plaintiff's

attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be

asserted under 42 U.S.C. § 1985.  *See Webb v. Goord*, 340 F.3d 105, 110 (2d. Cir. 2003)

(construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985

claim).  To maintain an action under Section 1985, a plaintiff "must provide some factual basis

supporting a meeting of the minds, such that defendants entered into an agreement, express or

tacit, to achieve the unlawful end."  *Webb*, 340 F.3d at 110 [internal quotation marks and

citations omitted].  Where a plaintiff does not provide such a factual basis, but only conclusory,

vague or general allegations, such a conspiracy claim fails.  *Id.* (dismissing conclusory allegation

"that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v.*

*Schneider*, 105 F.3d 857, 862 (2d. Cir. 1997) (dismissal of "conclusory, vague or general

allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general.  It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff.  (*See*, *supra*, Statement of Fact Nos. 25-26.)  The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary.  Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff.  Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact.  Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence

in support of his vague and conclusory allegation that Defendants Woods, Belarge and

O'Donnell entered into an agreement to achieve an unlawful end.  As a result, I recommend that

the Court dismiss Plaintiff's conspiracy claim.

### G.      Whether Defendants Are Protected by Qualified Immunity

In their memorandum of law, Defendants argue that they are entitled to qualified

immunity because they could not have reasonably known that their conduct was in violation of a

clearly established statutory or constitutional right.  (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of

Law].)  Liberally construed, Plaintiff's response argues (without citing any evidence) that, under

the circumstances, any reasonable person would have reasonably known their conduct was

violating Plaintiff's clearly established constitutional rights.  (Dkt. No. 42, Part 2 at 15-17 [Plf.'s

Response].)

Again, I must reject Plaintiff's conclusory argument.  "Once qualified immunity is

pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when

committed, violated 'clearly established statutory or constitutional rights of which a reasonable

person would have known.'" *Williams*, 781 F.2d at 322 (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 815 [1982]).  Regarding the issue of whether a particular right was *clearly established*,

courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable
> specificity'; (2) whether the decisional law of the Supreme Court and
> the applicable circuit court support the existence of the right in
> question; and (3) whether under preexisting law a reasonable
> defendant official would have understood that his or her acts were
> unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S.

962 (1992).[112]  Regarding the issue of whether *a reasonable person would have known* he was

violating such a clearly established right, this "objective reasonableness"[113] test is met if "officers

of reasonable competence could disagree on [the legality of defendant's actions]."  *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin*, 901 F. Supp.

757, 764 (S.D.N.Y. 1995) (citing cases); *Ramirez v. Holmes*, 921 F. Supp. 204, 211 (S.D.N.Y.

1996).  As the Supreme Court explained,

> [T]he qualified immunity defense . . . provides ample protection to all
> but the plainly incompetent or those who knowingly violate the law.
> . . . Defendants will not be immune if, on an objective basis, it is
> obvious that no reasonably competent officer would have concluded
> that a warrant should issue; but if officers of reasonable competence
> could disagree on this issue, immunity should be recognized.

*Malley*, 475 U.S. at 341.  Furthermore, courts in the Second Circuit recognize that "the use of an

'objective reasonableness' standard permits qualified immunity claims to be decided as a matter

of law."  *Malsh*, 901 F. Supp. at 764 (citing *Cartier v. Lussier*, 955 F.2d 841, 844 [2d Cir. 1992]

[citing Supreme Court cases]).

  Here, based on my liberal construction of all of Plaintiff's motion papers and response

papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others,

---

[112]    *See also Calhoun v. N.Y.S. Div. of Parole*, 999 F.2d 647, 654 (2d Cir. 1993); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994).

[113]    *See Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") (quoting *Harlow*, 457 U.S. at 819); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of

51

Plaintiff's claims based on qualified immunity.

### H.    Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary

judgment–which (at best) contains arguments regarding the issues discussed above–is without

merit.  I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of

Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to

the extent that Rule 7.1 Statement does contain citations to the record, the record generally does

not actually support the facts asserted.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("<u>Failure of the moving party</u>

<u>to submit an accurate and complete Statement of Material Facts shall result in a denial of the</u>

<u>motion.</u>") [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be

**<u>GRANTED</u>**; and it is further

**RECOMMENDED** that Plaintiff's motion for partial summary judgment (Dkt. No. 38)

be **<u>DENIED</u>**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days

within which to file written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d

Cir. 1993) (citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 [2d Cir. 1989]); 28

U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 17, 2006
        Syracuse, New York



George H. Lowe
United States Magistrate Judge